**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

EAGLE REALTY, LLC; GEL, LLC and GRL,
LLC, each a New York Corporation; and
GEORGE LAMBRAKIS, GREGORY
LAMBRAKIS, ALEXANDER LAMBRAKIS,
and EMMANUEL LAMBRAKIS

        Plaintiffs,

vs.

JOEL FOGEL; ERIC EDIDIN; FRANK
BITZAS; WILLIAM KAPLAN; NAT
TAYLOR;  TOM DIORIO; RON ASH;
GARY SINGER; BRAD SINGER; MARK
SCOTT KALLMAN; ARCHER CAPITAL
FUND, L.P., a Delaware Corporation;
PHOENIX BUILDING CORP.; M&E
ADVISORS, LLC; and REMUS HOLDINGS.

        Defendants.



No. **08 CIV 10638**

**JUDGE KARAS**
**JURY TRIAL DEMANDED**

## COMPLAINT

1.     Plaintiffs Eagle Realty ("Eagle Realty"); GEL, LLC; GRL, LLC; George

Lambrakis; Gregory Lambrakis; Alexander Lambrakis; and Emmanuel Lambrakis (collectively

"Plaintiffs") hereby allege and state the following Complaint against: Joel Fogel ("Fogel"); Eric

Edidin ("Edidin"); Frank Bitzas ("Bitzas"); William Kaplan ("Kaplan"); Nat Taylor ("Taylor");

Tom Diorio ("Diorio"); Ron Ash ("Ash"); Gary Singer ("G. Singer"); Brad Singer ("B. Singer")

(G. Singer and B. Singer collectively "Singer"); Mark Scott Kallman ("Kallman") (collectively

"Individual Defendants") and Defendants Archer Capital Fund, L.P. ("Archer"); Phoenix Building

Corp. ("Phoenix"), M&E Advisors, LLC ("M&E"); Remus Holdings ("Remus"); (collectively

"Corporate Defendants"), (the Individual Defendants and Corporate Defendants hereinafter referred to collectively as "Defendants")

2.     The following are at this time, non defendant entities:  ACF Hillside, LLC ("ACF"); SFN Capital ("SFN"); Leviathan Construction Management Services, LLC  ("Leviathan");  HRH Building Company, LLC ("HRH"); Hartman & Craven, LLP ("H&C Law Firm"); Key Bank ("Key"); and Countrywide Bank ("Countrywide") (collectively, "Non Defendant Entities").

## PARTIES

3.     Plaintiff  Eagle Realty, is a  New York corporation with its principal place of business at 175-61 Hillside Avenue, Jamaica Estates, New York.  George Lambrakis owns %34 of Eagel Realty; Gregory Lambrakis owns %33 of Eagel Realty and Alexander Lambrakis owns %33 of Eagel Realty.

4.     Plaintiff  GEL, LLC, is a  New York corporation with its principal place of business at 175-61 Hillside Avenue, Jamaica Estates, New York, Gregory Lambrakis owns %100 percent of the shares of  GEL, LLC.

5.     Plaintiff  GRL, LLC, is a  New York corporation with its principal place of business at 175-61 Hillside Avenue, Jamaica Estates, New York, George Lambrakis owns %100 percent of the shares of  GRL, LLC.

6.     Plaintiff George Lambrakis  resides in the County of Queens, State of New York.

7.     Plaintiff Gregory Lambrakis  resides in the County of Queens, State of New York.

8.     Plaintiff Alexander Lambrakis  resides in the County of Queens, State of New York.

9.     Plaintiff Emmanuel Lambrakis resides in the County of Queens, State of New York and is an agent/representative to Eagle; GEL, LLC; and GRL, LLC. This plaintiff has acted as a guarantor to the loans made by the other plaintiffs as enumerated herein.

10.     Defendant Fogel is an individual who's business address is 570 Lexington Avenue, 40th Floor, New York, New York 10022, Fogel at all relevant times was employed as an account manager at Archer, and/or other capacities, and/or upon information and belief has some ownership interest in Archer. At all times relevant hereto, Fogel voluntarily and knowingly participated in, cooperated with and/or allowed himself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

11.     Defendant Edidin is an individual who's business address is 570 Lexington Avenue, 40th Floor, New York, New York 10022, Edidin at all relevant times was employed as an account manager, and/or in other capacities, at Archer and/or upon information and belief has some ownership interest in Archer. At all times relevant hereto, Edidin voluntarily and knowingly participated in, cooperated with and/or allowed himself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

12.     Defendant Bitzas is an individual who's business address is in New York. Bitzas at all relevant times was employed as a commercial lending broker at SFN. At all times relevant hereto, Bitzas voluntarily and knowingly participated in, cooperated with and/or allowed himself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

13.     Defendant Kaplan is a licensed attorney in the State of New York, and an individual who's business address is 488 Madison Avenue, 16th Floor, New York, New York 10022, Kaplan at all relevant times was employed as an attorney at H&C Law Firm.  At all times relevant hereto, Kaplan voluntarily and knowingly participated in, cooperated with and/or allowed himself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

14.     Defendant Taylor  is an individual who's business address is  in New York. At all times relevant hereto, Taylor voluntarily and knowingly participated in, cooperated with and/or allowed himself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

15.     Defendant Diorio is an individual who's business address is  220 White Plains Road, Tarrytown, New York 10591.  Diorio at all relevant times was employed by Phoenix. At all times relevant hereto, Diorio voluntarily and knowingly participated in, cooperated with and/or allowed himself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

16.     Defendant Ash is an individual who's business address is 220 White Plains Road, Tarrytown, New York 10591.  Ash at all relevant times was employed by Phoenix.  At all times relevant hereto, Ash voluntarily and knowingly participated in, cooperated with and/or allowed himself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

17.    Defendant G. Singer upon information and belief is the owner and/or officer and/or controlling shareholder in the defendant companies HRH, M&E and Remus, and has his business address at 2200 Flethcer Avenue, 5th Floor, Fort Lee, New Jersey 07024.
At all times relevant hereto, G. Singer voluntarily and knowingly participated in, cooperated with and/or allowed himself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

18.    Defendant B. Singer upon information and belief is the owner and/or officer and/or controlling shareholder in the defendant companies HRH, M&E and Remus, and has his business address at 2200 Flethcer Avenue, 5th Floor, Fort Lee, New Jersey 07024.
At all times relevant hereto, B. Singer voluntarily and knowingly participated in, cooperated with and/or allowed himself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

19.    Defendant Kallman is a licensed attorney in the State of New York, and an individual who's business address is 1101 Stewart Avenue, Suite 303, Garden City, New York 11530, Kallman at all relevant times was employed as an attorney by plaintiffs. At all times relevant hereto, Kallman voluntarily and knowingly participated in, cooperated with and/or allowed itself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

20.    Defendant Archer is a Delaware corporation with its principal place of business at 570 Lexington Avenue, 40th Floor, New York, New York 10022. At all times relevant hereto, Archer voluntarily and knowingly participated in, cooperated with and/or allowed itself to be

utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

21.     Defendant Phoenix upon information and belief is a New York corporation with its principal place of business at 220 White Plains Road, Tarrytown, New York 10591. Phoenix upon information and belief is an entity that works with HRH on a number, if not all of its non union construction projects.  At all times relevant hereto, Phoenix voluntarily and knowingly participated in, cooperated with and/or allowed itself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

22.     Defendant M&E upon information and belief is a New Jersey corporation, registered to do business as a corporation in New York, with its principal place of business at 2200 Flethcer Avenue, 5th Floor, Fort Lee, New Jersey 07024.  At all times relevant hereto, M&E voluntarily and knowingly participated in, cooperated with and/or allowed itself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

23.     Defendant Remus upon information and belief is a New Jersey corporation, registered to do business as a corporation in New York, with its principal place of business at 2200 Flethcer Avenue, 5th Floor, Fort Lee, New Jersey 07024.  At all times relevant hereto, Remus voluntarily and knowingly participated in, cooperated with and/or allowed itself to be utilized by the various other Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

24.     ACF is a Delaware corporation with its principal place of business at 570 Lexington Avenue, 40th Floor, New York, New York 10022.  At all times relevant hereto, ACF voluntarily and

knowingly participated in, cooperated with and/or allowed itself to be utilized by the Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

      25.    SFN is a corporation with its principal place of business in New York.

      At all times relevant hereto, SFN voluntarily and knowingly participated in, cooperated with and/or allowed itself to be utilized by the Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

      26.    H&C Law Firm, upon information and belief is a New York professional corporation,  with its principal place of business at 488 Madison Avenue, 16th Floor, New York, New York 10022, and is a law firm who upon information and belief had conducted business for defendants Archer and ACF and at all relevant times did conduct business for defendants Archer and ACF.  At all times relevant hereto, H&C voluntarily and knowingly participated in, cooperated with and/or allowed itself to be utilized by the Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

      27.    Leviathan upon information and belief is a New York corporation with its principal place of business at 220 White Plains Road, Tarrytown, New York 10591.  At all times relevant hereto, Leviathan voluntarily and knowingly participated in, cooperated with and/or allowed itself to be utilized by the Defendants to further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

      28.    HRH upon information and belief is a New Jersey corporation, registered to do business as a corporation in New York, with its principal place of business at 2200 Flethcer Avenue, 5th Floor, Fort Lee, New Jersey 07024.  At all times relevant hereto, HRH voluntarily and knowingly participated in, cooperated with and/or allowed itself to be utilized by the Defendants to

further perpetuate, conceal, advance and accomplish the scheme to defraud, extort plaintiffs, and/or to take the property of the plaintiffs.

## JURISDICTION

29.     This action is brought under the federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961 et seq., and various other New York statutes and common law doctrines.  Jurisdiction is vested in this Court by virtue of 28 U.S.C. § 1331.

30.     A substantial part of the events and omissions giving rise to the claims stated herein occurred in this District and all Defendants are therefore subject to the personal jurisdiction of this judicial district.

31.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and to 18 U.S.C. § 1965(b).

## INTRODUCTORY ALLEGATIONS

32.     This is a complex civil action for RICO remedies authorized by the federal statutes at 18 U.S.C. 1961 et seq.; for declaratory relief;  for actual, consequential and exemplary damages;  and for all other relief which this honorable Court deems just and proper under all circumstances which have occasioned this Complaint.  See 18 U.S.C. §§ 1964(a) and (c), and other applicable Rico statutes.

33.     The primary cause of this action is a widespread criminal *enterprise* engaged in a *pattern of racketeering activity* across State lines, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during the past ten (10) calendar years.

34.     The predicate acts alleged here cluster around extortion, fraud and bank fraud. Other RICO predicate acts were actually part of the overall conspiracy and *pattern of racketeering activity* alleged herein, *e.g.* mail fraud and/or wire fraud.

35.    The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon Plaintiffs, with the intent of impairing, obstructing, preventing and discouraging Plaintiffs and their agents or contractors from completing a residential and commercial development of their property. Preventing, interfering and discouraging plaintiffs from borrowing monies for legitimate financial institutions, and to extort, defraud, and misappropriate monies and real property from plaintiffs by means of fraud, bank fraud and extortion.

36.    Eagle began doing business in September, 1997 and  owns a property located at 178-02 Hillside Avenue, Jamaica, New York 11432. This property is zoned for commercial use and zoning for an additional residential 120 apartment development is pending ("Mixed Use Project").

37.    GEL, LLC began doing business on or about November 25, 2002 and owns two properties, one located at 2908 Hoyt Avenue South, Astoria, New York 11102 and the other located at 2910 Hoyt Avenue South, Astoria, New York 11102. These properties are zoned for mixed use, restaurant and residential apartments.

38.    GRL, LLC began doing business on or about November 25, 2002 and owns a property located at 32-76, 31st Street, Astoria, New York 11102. This property is zoned for a medical office.

39.    The particular Rico provisions that apply here, if not otherwise enumerated herein, but are not limited herein, are Sections 1962 (c) and 1962 (d).

## THE LOANS MADE BY ARCHER

### THE $7.4M LOAN:

40.    A loan was made on August 28, 2006 by Archer to Eagle in a principal amount of $7,400,000.00 dollars.

41.    Said loan was made to re-finance the current loan on the Mixed Use Project and to provide additional monies to carry that project forward until re-zoning for said project was approved and the site developed in accordance to a mixed commercial and residential use.

42.    Interest reserves held for interest payments on this loan amounted to $462,500.00 as reflected by the settlement statement and in particular schedule C thereto, attached hereto as Exhibit 1.

43.    This interest reserve was held in accordance with section 1.7 of the mortgage and provided that Archer was to hold these designated interest reserve funds at Archer's designation either in a separate account or commingled with Archer's general funds, nevertheless, Archer failed to provide plaintiffs with any proof that these funds were in fact funded and either held in a separate account or in Archer's general funds.

44.    The interest reserve for the $7.4M loan was increased by $236,388.89 on or about March 8, 2007, when the a $2,600,000.00 million dollar loan ("$2,6M loan") was secured, which loan is referenced below.   In addition, $210,815.14, from the $2,6M loan was to be provided in a soft cost reserve account for this $7,4M loan, an accounting of which, and location of funds, was never provided to plaintiffs, even after repeated requests for this information to Archer, Foegal, and Kaplan.

45.     The initial intent was that the $7.4M loan was hold plaintiffs over until June 30, 2007, when the re-zoning of the project was to be approved and with this approval to pay off the $7.4M loan and for Archer, Fogel, SFN and Bitzas to secure institutional funding because the project would have been approved by the required municipality, and could be constructed as planed. And/or for Archer to then provide monies to pay this loan off and complete the project. Consequently, the interest reserve in total for this loan contained nine (9) months of interest payments, as that was the amount contemplated to take that loan through June 2007.

46.     On February 28, 2008 a payoff letter was issued indicating a payoff balance of $9,114,951.47, which amount purportedly contained a default interest rate along with penalties. A true copy of that payoff statement is attached hereto as Exhibit 2.   The $7.4M loan was allegedly paid off on February 28, 2008.

47.     Upon information and belief, no appropriate default notices as required under the $7.4M loan documents were sent by Archer to Eagle.

48.     On October 02/2007, a loan term sheet was provided by Archer to plaintiffs for a $20,000,000.00 loan to close on or before October 31, 2007.  This loan was made for the purpose of paying off the $7,400,000.00 loan, pay down the $2,6M loan and remove the cross collateralized portion thereto,  and to fund the construction, now that the re-zoning was approved for the Mixed Use Project, and same could be built accordingly.

49.     There was never any mention of the $7,4M loan being in default at this time.  An agreement for the start-up fee and other expenses was signed on October 09, 2007 and monies were transferred from the soft cost reserve, held on behalf of the $7,4M loan to pay the fees required by Archer in respect to the $20,000,000.00 loan, again, particularly at this time, without any other written or verbal indication that the $7,4M loan was in any default condition.

50.     On or about January 24, 2008, Archer made payments in respect to the Mixed Use Project and for the benefit of plaintiffs. See Exhibit 3 a true copy of checks written by Archer for the benefit of the Mixed Use Project and plaintiffs.

51.     Said checks were written in accordance with a written document dated December 18, 2007.  A true copy of this document is attached hereto as Exhibit 4.   Said document enumerated that these checks were being advanced in accordance with the terms and conditions of the $7.4M loan, which document did not reflect any default there under of said $7.4M loan, nor made any mention to default provisions of said loan.  Accordingly, on December 18, 2007; January 24, 2008 and February 28, 2008 (as reflected by two representations letters, one from E. Lambrakis, and the other from George Lambrakis; Gregory Lambrakis and Alexander Lambrakis, dated February 2008, infra paragraph 96 and exhibit 15), the $7.4M loan was not in any default status as evidenced by defendant Archer's conduct.

52.     Although Archer, Fogel, Ediden's, and Bitzas's conduct, representations and actions indicated that at or before the closing of the $20,000,000.00 or other loan relating thereto, the $7.4M loan was in fact not in default or considered in default, by declaring it in default at the closing of this new loan (which plaintiffs did not attend and signed blank signature pages the evening before, and without having seen the payoff statement), and inflating the amounts actually owed, these defendants told plaintiffs, after the purported closing, that there was not enough monies to payoff the $325,000.00 cross collateralized portion of the $2,6M loan, and therefore that portion of the $2,6M loan which was supposed to be paid off at closing, remained, which continued to keep that loan cross collateralized with the Mixed Use Project, irrespective of the fact that there was sufficient equity in the property that this loan was secured by to make the loan in the first place, and to keep it separate and apart from financing made in respect to the

Mixed Use Project.  Simply, the declaration of the the $7,4M loan default, and adding default interest and penalties calculated there under, were simply made in furtherance of the Defendants fraud and scheme to extort plaintiffs.

**THE $2.6M LOAN**:

53.     The $2,6M loan was made on  March 8, 2007  by Archer to GEL, LLC and GEL, LLC in a principal amount of $2,600,000.00 dollars.   There was an interest reserve for that loan in the amount of $390,055.56.   The $2.6M loan had an interest rate of 14%.   Therefore, interest should have been pre-paid through April 1, 2008.    On February 28, 2008, an additional $156,008.05 was added to the interest reserve for this loan, thereby extending the pre-paid status of this loan until May, 2009.   Additionally, at this time the loan principal was paid down to $1,600,000.00.

54.     On August 13, 2008 a payoff letter was issued indicating a payoff balance of $1,789,439.65.  This payoff letter showed a principal amount owed of $1,600,000.00, "Interest and Fees Due" of $189,422.94, and a "Remaining Escrow" of ($1,483.29).  Although numerous demands had been made by plaintiffs attorney to  Archer, Fogel, H&C  and Kaplan for a particularized accounting of the amounts due in respect to the  "Interest and Fees Due" of $189,422.94, and a "Remaining Escrow" of ($1,483.29), no such supporting materials have been provided.

55.     The purpose of Archer, Fogel, H&C and Kaplan's failure in the first instance to supply a payoff letter when requested, and then not to explain the above items in such pay off letter when finally delivered, was to continue a fraud and scheme to extort plaintiffs, and prevent plaintiffs form once again borrowing monies from legitimate financial institutions to pay off the $1,600,000.00 owed on this loan, for which plaintiffs had the ability to borrow, however, without

an exact pay off, or a payoff that was not inflated, the plaintiffs could not re-finance the remaining principal on the loan.

56.     Likewise, because the $2,6 M loan was cross collateralized with the $7,4M loan, by not providing plaintiffs with true and correct payoff information, and thus interfering with plaintiffs re-finance of this loan, the $2,6M loan remained cross collateralized with the $7,4M loan and would also be so collateralized with the $20,000,000.00 or other funding Archer was to provide and under Archer's control.

57.     It was the Defendants intention to do what they had to do to keep the $2,6M loan in place, and collateralized with other of Archer's loans,  in order to potentially force plaintiffs into defaults there under in the future, which is what they eventually did, and/or to put further pressure on plaintiffs through the control of this cross collateralized loan to act as Defendants desired.

58.     Under the terms of the $25,250M Loan, *infra*, $1,000,000.00 was paid to reduce the principal to $1,600,000.00 and another $156,008.05 was applied to this loan as "Archer GEL loan interest due and reserves" without any specification as to what same were to be applied too. A copy of a settlement statement with respect to the $25,250M Loan and the above referenced items is attached hereto as Exhibit 5  Consequently, the $2.6M loan had sufficient interest reserves so that it could not have been in default on August 13, 2008, and there could not have been $189,422.94 in interest and fees due as Archer had represented on the August 13, 2008 payoff statement after it was finally sent, again after numerous demands were made for same.

59.     Upon information and belief, no formal default notices as required under the loan documents were sent by Archer to GEL, LLC., and the plaintiffs contend that this loan was never in default.

60.    Assuming that there was a purported default based on a cross collateral loan agreement, the maximum amount that could possibly be in default was $325,000.00, which plaintiffs deny any default in the first instance.  There should have been sufficient interest reserves to keep the $2,6M loan in good standing until October 2008.


**THE $25,250M LOAN**:

61.    Eagle sent to Archer a notice of defaults on August 29, 2008, A copy of which is attached hereto as Exhibit 6.

62.    No formal closing ever took place with respect to the $25,250M loan.  On or about February 26, 2008, more than one month after Archer had committed to that loan, Kallman told plaintiffs that because of time constraints, the lender's attorney, Kaplan, did not have time to prepare all of the loan documents.  Fogel, and Archer, would not proceed with the loan and preparation of documents unless plaintiffs signed blank signature pages by February 27, 2008, and if plaintiffs did not do so, once again, Fogel, Archer, SFN, Bitzas and Kaplan threatened that there would be no loan and plaintiffs would loose all their properties.

63.    The $25,250M loan documents were not provided to plaintiffs at any closing, and only blank signature pages were provided plaintiff by  Kallman, H&C and Kaplan, and used to close the loan without plaintiffs being present at any such closing and/or reviewing any set of final documents and the terms and conditions therein.

64.    The signing of the blank signature pages took place in Kallman's office and the process finished without any of the defendants or their counsel being present.  This was undertaken between 11:00 p.m. and 11:30p.m. on the evening of February 27, 2008. Upon information and belief, the alleged applicable loan documents which required notaries

verification, were never notarized in the presence of plaintiffs and no notary was present when plaintiffs executed the blank signature pages provided them.

65.     The alleged closing documents show that they were signed by Archer and Ediden the next day, February 28, 2008.

66.     The blank signature pages signed for the most part do not have any footer notation that corresponds to the purported closing documents, which evidences that the plaintiffs never knew what signature page went with any corresponding closing documents, and therefore could be attached to any documents Defendants desired as no draft documents and/or final documents were provided for a comparison, which is additional evidence of the Defendants fraud and plans of extortion here.

67.     By 01/31/08, as evidenced by Archer and Fogel's own admissions, the loan documents were allegedly to be circulated in draft form on 01/31/08.  See Exhibit 7, Fogel e-mail dated 01/31/08, 9:01a.m. to Bitzas.  Consequently, as draft documents were prepared and circulated as Fogel indicated, why was there no documents at the alleged closing some 27 days later for plaintiffs review.

68.     None of the $25,250M loan documents were provided to plaintiff until August 28, 2008, when partial documents were provided to them by Kallman,  at a meeting with Kallman, which was a day before plaintiffs declared Archer in default for failing to fund any monies in respect to the construction monies borrowed in respect to the $25,250M loan.  These documents were also not as represented to plaintiffs and contained documents never contemplated, mentioned nor negotiated.  Likewise, the payoff letter for the $97,4M loan was dated February 28, 2008, after the blank pages were signed by plaintiffs, and which the plaintiff could not have possibly seen at the signing of the blank pages.

69.     On August 28, 2008, plaintiffs met with Kallman, he was unable to produce an entire and complete set of closing documents in respect to the $25,250M loan.

70.     However, irrespective of the fact that Archer admits at least draft loan documents were circulated on 01/31/08 and on March 5, 2008, a co-lender agreement was executed which particularly references on exhibit A these loan documents, no copy of same was provided plaintiffs who had just allegedly borrowed $25,250,000.00, and who were likewise forced to enter into an equity agreement with ACF, likewise by signing blank signature pages for documents never contemplated, reviewed or commented on.  A true copy of the co-lender agreement is attached hereto as <u>Exhibit 8</u>.

71.     In accordance with the $25,250M loan documents, $2,297,750.00 was to be placed in an interest bearing account of a financial institution and was depicted as interest reserve funds, so designated to pay the monthly interest on the $25,250M loan.   Attached hereto as <u>Exhibit 9</u> is a true copy of the Interest Reserve Agreement.

72.     Upon information and belief, there was never $2,297,750.00 deposited into an account in accordance with Archer's obligation under the Interest Reserve Agreement, nor an account ever opened.

73.     According to the Building and Loan Agreement, article II, section 2.1, lender's minimum advance was to be $500,000.00.  In section 2.3 of article II, lender agreed to make such advances available in the Building Loan Trust Account.  Upon information and belief, no such account was ever opened by Archer and/or funded.

74.     Additionally, $156,008.05 was to go to an interest reserve in respect to the $2.6M loan and $596,400.28 was to go to an interest reserve in respect to the unfunded and to be funded

construction draw monies which $10,481,136.00 was to be available for plaintiff, and which was never drawn upon.

75.     Upon retention of the undersigned new attorneys, and after almost a month of demands made for an accounting of the interest reserves for all loans made by Archer to plaintiff, and payoff demands, instead of providing same, a notice of default was served on or about October 13, 2008, which notice contained purported payoff information and reconciliation of the interest reserve accounts.  Attached hereto as <u>Exhibit 10</u> is a copy of that schedule.

76.     The schedule does not provide an accounting of the additional $156,008.05 which was to be applied on or about February 28, 2008 and added to the interest reserve for the $2.6M loan.

77.     The schedule shows an interest reserve for the $25,250M loan principal owed as starting with an amount of $1,701,649.72 which is some $596,100.30 short of what was required to be placed into a financial institutions account under the Interest Reserve Agreement and does not reflect any interest reserve amount of $596,400.28 in respect to that portion of the construction draw proceeds from the $25,250M loan.

78.     The settlement statement shows that the interest reserve for the principal loan was ear marked as $1,691,950.00, and that $596,400.28 was ear marked for the construction draw portion of the $25,250M loan, yet these amounts only total $2,288,350.20 and would still be short $9,399.80 as was required under the Interest Reserve Agreement's requirement of $2,297,750.00 to be held in a financial institution.

79.     Irrespective of this error or misrepresentation, and/or failure by Archer, upon information and belief, approximately $596,100.30 is not accounted for on the schedule.

## THE EXTORTION SCHEME BEGINS

80.      It appears, that the initial $7,4M Loan was made in good faith and legitimately, however, irrespective of this, the $7.4M loan was due in July 2007, and for which plaintiffs were seeking institutional re-financing of.  Prior to that loan maturing however, Archer made the $2,6M loan and negotiated with plaintiff for Archer to provide plaintiff with a loan in an amount of $20,000,000, which particularly anticipated the re-financing of the $7.4M loan, and $1,350,000.00 reduction of  $2,6M Loan, and thereby the removal of the $2,6M loan cross lien on the Mixed Use Project; providing new monies and construction funding for the Mixed Use Project; providing an interest reserve to pay for this financing through the completion of construction; and monies to cover the closing costs for this loan.

81.      At this time the budget accepted by Archer was approximately $7,500,000.00. The payoff of the $7,4M loan, the $7,500,000.00 construction budget for the Mixed Use Project, payment of $1,350,000.00 on the $2,6M loan, and therefore elimination of the cross lien, all resulted in approximately $16,250,000.00, which left the remaining funds for an interest reserve (approximately one year) and loan closing costs, this is exactly how the $20,000,000.00 was going to be used, and represented by Archer, Fogel, SFN and Bitzas at all times.

82.      Archer; Bitzas and SFN assured plaintiff that they would secure a $20,000,000.00 loan for plaintiffs prior to the maturity of the $7.4M loan, in order to pay off the $7.4M Loan and provide financing for the Mixed Use Project.   And that such financing would be available before the maturity of the $7.4M loan.

83.      On or about April 2007, in furtherance of this assurance that the Mixed Use Project would receive funding and the $7.4M loan would be timely re-financed, Fogel, and Archer introduced plaintiff to an individual from Key, who Fogel had represented was funding

$20,000,000.00. Fogel, Archer, SFN and Bitzas told Plaintiffs that Key was interested in funding the construction loan for $20,000,000.00, and thereafter a permanent loan for $28,000,000.00 upon completion of the Mixed Use Project, with an interest rate of %6.2.  When plaintiffs asked Archer why under the Archer loan they would pay more then twice the interest Key was going to charge, Archer, Fogel, SFN and Bitzas responded that they would guaranty the loan for plaintiffs, to ensure that the loan was given immediately and the Mixed Use Project could begin as soon as possible given that leases with occupancy dates were already provided by plaintiffs to perspective tenants, and then once the Mixed Use Project was completed, like the Key offer, more  monies would be available, and the rate would drop as plaintiffs would now have a built project with full occupancy.

84.      In fact on or about May 9, 2007 Archer; Bitzas and SFN provided plaintiffs with a correspondence from Key, indicating this financial institutions willingness to make a loan in the amount of $20,000,000.00, and thereafter a $28,000,000.00 facility.  Attached hereto as <u>Exhibit 11</u> is a true copy of this Key correspondence.

85.      Additionally, on or about  May 8, 2007, Countrywide indicated its willingness to make a loan to plaintiffs in an amount of $23,000,000.00.   A true copy of this correspondence is attached hereto as <u>Exhibit 12</u>.  Archer; Bitzas and SFN were likewise aware of this Countrywide financing.

86.      At all times, although Archer; Fogel, Edidin, Bitzas and SFN were each and collectively aware of the potential financing from both Key and Countrywide, they assured plaintiffs that Archer would provide $20,000,000.00 in financing and not to worry about the existing $7.4M loan, and that same would be taken care of in the $20,000,000.00 financing.

87.     Finally, on or about October 2, 2007, Archer did in fact provide plaintiffs with a loan term sheet for $20,000,000.00 in financing.  Which loan terms sheet was re-drawn on or about October 8, 2007.  A true copy of the Archer October 8, 2007 loan term sheet is attached hereto as Exhibit 13.

88.     Said $20,000,000.00 loan was to close by October 31, 2007.

89.     On October 9, 2007, a letter agreement was entered into between plaintiffs and Archer, which provided for the payment of $45,000.00 in fees to be paid in respect to the proposed $20,000,000.00 loan, and to use the interest reserve funded in respect to the $7,4M loan in an amount of $39,034.79 to pay down this amount, additionally.

90.     This very same correspondence makes no reference to any default of the $7,4M Loan, instead, this document references the $7,4M Loan as if it was current and in place, as was represented to plaintiffs by Archer, Fogel, SFN and Bitzas at all times.  Attached hereto as Exhibit 14 is a true copy of that October 9, 2007 letter agreement.

91.     With respect to this $20,000,000.00 loan, Fogel, Archer, SFN and Bitzas were provided a construction budget by plaintiffs, said budgeted amount was approximately $7,500,000.00, which budget was provided to Fogel and Archer, and which Archer accepted.  Additionally, Archer, Fogel and Bitzas were in contact with Gregory Georges and/or Georges Associates, P.C., his company (plaintiffs structural engineer, hereinafter collectively "Georges") who was the construction manager for plaintiffs and who had a contract in place with plaintiffs to build the Mixed Use Project, the budget made by Georges, which had been accepted by Archer, and generally with Georges as the construction manager and review of all contractors to be used, none of which Archer had any problem with using at this particular time, and generally at all relevant times.

92.     Archer refused to close the $20,000,000.00 loan on October 31, 2007 because they for the first time said they did not like the budget provided, they did not like the contractors to be used despite the fact that by October 25, 2007, both the budget and contractors had been previously approved by Archer, and for the first time Archer now demanded that plaintiffs bond the project as a condition to loan the $20,000,000.00. Said bonding was not a requirement of the October 8, 2007 documentation. Most importantly, there was no reason not to fund the $20,000,000.00 at this time as the re-zoning for the Mixed Use Project had received final approvals from the municipality and therefore the Mixed Use Project could be built as anticipated.

93.     Archer had no legitimate reason not to close the $20,000,000.00 loan on October 31, 2007. As a matter of fact, from 10/31/07 to February 28, 2008, nothing of any significance generally, and upon information and belief, anything, was needed, and/or added to the Mixed Use Project and funding requirements that was not in place on October 31, 2007, or could have been readily provided for an October 31, 2007 closing.

94.     The only change being, that Archer, Fogel, SFN, Bitzas, HRH, G. Singer, B. Singer, and M&E through fraud, deception, misrepresentation, and in accordance with a plan to defraud and extort plaintiffs, had now inflated the required financing to $26,000,000.00 by adding approximately $1,400,000.00 in improper default interest and penalties on the $7,4m loan. $1,300,000.00 for a management fee and salaries to Phoenix, $135,000.00 as a fee to Taylor, an additional $3,000,000.00 to the otherwise approved budget, and $213,625.00 in points.

95.     This loan amount insured that a loan could not be obtained from an institutional lender such as Key or Countrywide, as it increased the loan to value ratio from 55% to 80% and

therefore outside of such institutions underwriting guidelines.  Plaintiffs now, had to go through with the financing from Archer or face the loss of their properties as threatened by Archer, Fogel and Bitzas.

96.      Allegedly in July 2007, both the $7,4M Loan and the $2,6M loan were in default, and Archer had threatened foreclosure and that plaintiffs would lose the properties secured by such loans.   However, other then enumerated herein, another documents prepared by Archer's counsel, allegedly Kaplan and H&C Law Firm, had E. Lambrakis separately, and George Lambrakis; Gregory Lambrakis and Alexander Lambrakis together, represent via two separate documents that there were no "loans from any party with respect to which I am an obligor are not in default, and are currently in good standing."  See Exhibit 15 a true copy of these two representations letters.  However, as Archer, Fogel, Edidin, Bitzas, Kallman, H&C Law Firm and Kaplan, well knew, E. Lambrakis; George Lambrakis; Gregory Lambrakis and Alexander Lambrakis were obligors under the $7,4M loan and $2,6M loan as they had either executed individual guaranties with respect to same and/or otherwise were obligated under the loan documents and accompanying documents.  Since Fogel, Edidin, Archer and/or  their counsel, and/or Kaplan, Kallman, either prepared, and/or accepted these representations letters, there could have been no default on February 28, 2008, and the $7,4M loan was in fact in good standing.  Additionally, this conduct by Fogel, Ediden, Archer and their counsel represents a fraud against Archer, M&E and other financial institutions (upon information and belief at least Key and Countrywide) involved in the funding or underwriting of the $25,250M loan, and/or otherwise involved in the actual or potential funding the Mixed Use Project.

97.      If Fogel, Edidin, Archer, and Kaplan argue that in fact the $7,4M loan and/or the $2,6M loan, or any loans they made to plaintiffs were in default, then their preparation,

acceptance, or use of this E. Lambrakis letter represents an intentional fraud by these defendants against others and at the very least presents an issue as to a bank fraud and/or fraud generally by these defendants.

98.    Alternatively, if these defendants were not by this act committing any type of bank fraud or fraud generally, likewise, then their preparation, acceptance, or use of this E. Lambrakis letter represents that there is in fact no default, and the default monies collected and or made to be paid by plaintiffs was not legally due and therefore these defendants misappropriated and extorted plaintiffs monies.

99.    Additionally, instead of Archer foreclosing on said loans, as they had threatened, assurances where made by Archer, Fogel, SFN and Bitzas that Archer would loan plaintiffs $20,000,000.00 by October 31, 2007 to pay off the $7,4M loan and to finance the construction of the Mixed Use Project.   Not only were these assurances made, but the October 9, 2007 letter agreement which provided use of reserve funds in respect of the $7,4M Loan, to pay the fees owed on the $20,000,000.00 loan provided no reference whatsoever of the $7,4M Loan being in default or that there were any problems in closing on October 31, 2007 as anticipated by plaintiffs, and as represented to plaintiffs.

100.    Although, allegedly, the $7,4M Loan was in default, as referenced by a letter to plaintiffs dated July 11, 2007 and required payment of the July interest rate by July 31, 2007, or face "immediate commencement of foreclosure proceedings in the Supreme Court Queens County," no such "immediate" action was taken by Archer.

101.    The $20,000,000.00 loan was promised to close by October 31, 2007, however Archer intentionally refused to close said loan on October 31, 2007.

## THE EXTORTION SCHEME IS IMPLIMENTED

102.    At this point, a scheme to extort the plaintiffs' properties and to extort monies from plaintiffs by Archer, Foegal; Bitzas and Defendants was in full swing.

103.    Plaintiffs had at Archer, Fogel, SFN and Bitzas's requests, stopped negotiating in May 2007 further with Key and Countrywide with respect to the loans they intended to make to plaintiffs and because of their reliance on Archer making the $20,000,00.00 loan, and therefore these financial institutions would have to start the process over, if they were even still interested, which was too late at this point.

104.    The $7,4M Loan and $2,6M loan were allegedly in default and Archer now threatened immediate foreclosure, irrespective of the fact that prior to this they indicated they would not foreclose, that there was in fact no default, and that the loans would be paid form the $20,000,000.00 loan.

105.    Assuming that Archer closed as represented, on October 31, 2007, the $7,4M Loan if in fact in default would only be in default for four months, not the approximate nine months that Archer claimed said loan to be in default, when the $25,250M loan was finally made on February 28, 2008 and for which they took payment in default for this period of time.

106.    In order to satisfy this new bonding requirements placed on plaintiffs by Archer, plaintiffs thereafter sought bonding. One of the bonding companies that plaintiffs spoke with indicated that they did not believe that Archer was going to make the loan, and that they intended on taking the project from Plaintiff. Further, that entity told plaintiffs that HRH was behind Archer, and was an entity alleged to have recently been under indictment or alleged to have been involved in criminal conduct, fraud and extortion, and for which this company provided plaintiffs with such documentation.

107.    Based upon this, plaintiffs did in fact do research on HRH and provided its findings along with the documents given to them, to Archer, Fogel, SFN and Bitzas, that in fact HRH was under investigation and alleged to have been involved in criminal conduct.

108.    Fogel, Archer, SFN and Bitzas assured plaintiffs that Archer intended to make the loan and in fact had the financial resources to finalize said financing and did not want to take over the Mixed Use Project and that HRH had nothing to do with Archer making the $20,000,000.00 loan and simply that HRH was acting as Archer's consultants in respect to the Mixed Use Project.

109.    Plaintiffs concerns that Archer could not fund the entire facility was advanced to Archer, Fogel, SFN and Bitzas by plaintiffs as an internet search of Archer revealed that although Archer made numerous loans, none from this research revealed any such loan exceeding $4-6 million dollars. Therefore, plaintiffs sought assurances from Archer that it in fact could fund the facility here, which Archer, Fogel, SFN and Bitzas again assured plaintiffs that Archer could fund the facility, would fund the facility, and that Archer was doing so on its own.

110.    After repeated requests by plaintiffs to close the $20,000,000.00 loan, and with respect to closing the $20,000,000.0 loan, on or about November 14, 2007, Archer and Fogel asked to meet with plaintiffs. The only other individuals who were supposed to attend this meeting was Georges. However upon arrival at this meeting, plaintiffs found that SFN and Bitzas were in attendance. Phoenix was there. Likewise, Edidin, a principal of Archer and an individual identified as G. Singer, were also in attendance. Singer was introduced by Fogel as a principal of HRH, and that he, and HRH were the consultants to Archer in respect to the $20,000,000.00 and its business with plaintiff and the Mixed Use Project.

111.    At or around this time Archer, Fogel, SFN and Bitzas required plaintiff to retain Nat Taylor and his company Northern Freedom, Co. (collectively hereinafter "Taylor") as the owners representative to Archer, with an annual salary of $135,000.00.

112.    At the November meeting HRH by Singer talked down too and denigrated Georges, plaintiff's agent, who indicated that the Mixed Use Project would take nine (9) months to complete, and insisted that at a minimum the Mixed Use Project would take 18 months to complete.

113.    On or before July 29, 2007 Archer had plaintiffs phase II environmental report. B. Singer was presented with a Phase II environmental report at that time, which he indicated was acceptable.

114.    Later on, Archer and B. Singer, and Fogel used the request by the New York City Department of Buildings for a repeated phase II as an excuse to withhold funding the Mixed Use Project, although, at that time HRH, allegedly only acting as Archer's consultant had accepted the phase II report as is.

115.    HRH and Archer prior to the November 14, 2007 meeting apparently contacted Phoenix and/or Nat Taylor to review the plaintiffs budget and prepare a new budget. Phoenix and/or Taylor did prepare a new budget which budget came in at approximately $9,000,000.00. See Exhibit 16 a true copy of this budget.

116.    At this November meeting HRH, G. Singer and Archer indicated that they no longer liked the prior $7,500,000.00 budget nor the $9,000,000.00 budget that Phoenix and/or Taylor came up with at their request, and made it apparent that they were attempting to push Georges out and that they were going to come up with a new and higher budget.

117.   At this same November meeting, Archer by Fogel said that he wanted a new budget to come in around $12,000,000.00 because that is what HRH wanted to see as a budget.

118.   Archer by Fogel said to Taylor and Phoenix to make the budget $11,800,000.00 and to add a fee to Phoenix of $600,000.00 and $700,000.00 for salaries for the year, as a result of this, the budget as determined by Phoenix, and Taylor, for Archer was now roughly $13,000,000.00, and $1,000,000.00 over what Archer and HRH had said they wanted the budget to be. A true copy of the Phoenix budget is attached hereto as Exhibit 17. This budget was prepared prior to plaintiffs executing the contract with Phoenix on February 1, 2008.

119.   Because Archer and HRH wanted the budget to be $13,000,000.00, instead of the $7,500,000.00 originally approved, Archer and HRH demanded that a new loan amount would be increased to the amount of $26,000,000.00 not the $20,000,000.00 previously agreed upon and which should have closed in October 2007.

120.   Archer by Fogel said that Archer would not lend $26,000,000.00 based upon the prior Key and Countrywide amounts, but would only make the $25,250M loan to plaintiff, however, Archer would come up with $900,000.00 as an equity partner in the project and would not make any loan unless plaintiffs accepted Archer as an equity partner in the Mixed Use Project and committed to the $25,250M Loan and the Archer taking an equity position in the Mixed Use Project.

121.   Additionally, yet another condition, which was not required prior to this meeting was imposed on plaintiffs' as a take it or leave it condition, that Archer, Fogel and HRH did not want Georges as the construction manager any longer.

122.   As a result of this, plaintiffs gave Archer a list of at least five entities for consideration as the construction  manager.

123.    Archer without reason rejected four of these entities without any reason, or for any good cause.  The only entity accepted by Archer and Fogel was one company that could not start plaintiffs project for nine (9) months.  Consequently, because the Mixed Use Project needed to be built timely, that entity could not reasonably be used here.  Therefore, Archer, and Fogel directed that plaintiff use Phoenix as the construction manager, an entity upon information and belief that Archer and/or other of the Defendants had prior business relations with, and that if Phoenix was not used, there would be no loan, and Archer would foreclose on plaintiffs properties under the $7,4M Loan and $2,6M loan.

124.    As of November 27, 2007, it was clear the HRH had infiltrated the deal here and was pulling all the strings.  A correspondence from Bitzas to Taylor confirms this.  That e-mail clearly indicated a meeting with HRH and that Taylor needed to prepare a new budget and provide additional details on the Mixed Use Project for HRH.  See Exhibit 18.

125.    Finally, on or about January 24, 2008, Archer provided plaintiffs with another loan term sheet for the $25,250M Facility, a true copy of which is attached hereto as Exhibit 19, which expired on January 25, 2008, and which contained an underwriting requirement that Phoenix was to be the construction manager, which was not a condition of the October 2007 loan term sheet.  Plaintiffs under duress signed this term sheet, which was represented as a commitment in order that Archer would not withdraw its term sheet/purported commitment as Archer indicated that it would not accept any changes to the term sheet and it had to be signed by the morning or there would be no loan made and Archer would foreclosure on the $7.4M loan and $2,6M loan immediately and plaintiffs would lose their property.

126.    On or about February 1, 2008 at the direction of Archer, Eagle executed a contract with Phoenix in order for the $25,250M Facility loan to be made, which contract Archer negotiated and gave to plaintiffs simply to sign without change.

127.    On or about February 28, 2008, the purported closing date, none of the $25,250M Loan documents were produced in their entirety, nor was there a formal closing with all parties and there attorneys present, instead, plaintiffs were directed at just before midnight the day before, to sign blank signature pages, or there would be no loan and they would loose their properties.   Plaintiffs never were given a set of full loan documents to review and for signature at any formal closing, and no purported final copy of any documents were provided plaintiffs until months after the February 28, 2008 date.

128.    Upon information and belief, Archer, H&C Law Firm and/or Kaplan filed the corporation ACF on or about February 28, 2008, and entered into the purported agreement with plaintiff whereby ACF retained an equity position in Eagle, a copy of which is attached hereto as Exhibit *.   Plaintiff never reviewed an entire agreement and/or signed an agreement with respect to any equity agreement in whole at any closing.

129.    During the period of March 2007 through February 28, 2008 Archer, and Fogel had all of plaintiff's potential tenants for the Mixed Use Project, leases go through them and in fact Fogel negotiated directly with Staples, NYSC, T-Mobil, in particular but not limited to allowing scaffolding to be placed around the exterior of the building when constructed.

130.    Between October 31, 2007 and February 28, 2008, Archer, Fogel, Bitzas, SFN, and Phoenix, under the direction of HRH, had the proposed budget for the Mixed Use Project increased by at least $1,400,000.00 in unlawful default interest and expenses, increased same by $1,300,000.00 for commission and salaries to Phoenix, and by $3,000,000.00 in added